J-A29014-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN RE: ESTATE OF JOHN J. THOMAS, DECEASED | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: TIMOTHY J. UNGAREAN | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 522 WDA 2019 |

Appeal from the Order Dated March 28, 2019
In the Court of Common Pleas of Beaver County Orphans' Court at
No(s):  No. 04-14-1068


BEFORE:   BENDER, P.J.E., MURRAY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                    FILED MARCH 6, 2020

Timothy J. Ungarean ("Appellant") appeals from the order dated March 28, 2019, and entered on April 2, 2019, by the Court of Common Pleas of Beaver County, Orphans' Court Division, finding the will purportedly executed by John J. Thomas, deceased ("Mr. Thomas"), invalid, and granting Petitioners' motion to revoke letters testamentary.[1]  After careful review, we affirm.

We glean the following facts and procedural history from the record. Following the death of Mr. Thomas on October 12, 2014, Appellant offered for probate a writing, dated July 7, 2014, which purported to be the last will and

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Petitioners are the eight surviving nieces and nephews of the deceased: David George, Theresa A. Thomas, Carol L. Thomas, Norman J. Thomas, Anna Marie Rheingrover, Alex C. George, Charles T. George, and James H. George (collectively "Petitioners").

testament of Mr. Thomas and named Appellant as the sole beneficiary of the estate. On October 23, 2014, the Beaver County Register of Wills admitted the will to probate and granted letters testamentary to Appellant. Alleging forgery of the will, Petitioners challenged its validity and sought to have the letters testamentary revoked with the filing of a petition for citation sur appeal from probate on December 16, 2014. On December 31, 2014, the orphans' court awarded a citation and directed Appellant to show cause why the letters testamentary should not be revoked. Appellant filed a response to the petition for citation on January 13, 2015.

Following discovery and pre-trial proceedings, an evidentiary hearing commenced before the Honorable John D. McBride, on June 27, 2016. On the morning of the third scheduled hearing day, counsel for Petitioners stated that he and Appellant's counsel would like to put a settlement agreement on the record. After extensive discussion before the court regarding the terms of the alleged settlement, the agreement did not reach fruition and, at the request of Petitioners, the hearing was continued to a later date.

By August 2, 2016, no written settlement agreement had been entered, and Appellant filed a petition to enforce an oral settlement agreement. Petitioners filed an answer on August 11, 2016, in which they asserted that the essential terms of an agreement were never reached and, thus, there was no settlement agreement for the court to enforce. On August 24, 2016, Appellant's petition was denied by the court.

On December 5, 2016, the court ordered and decreed that Judge McBride must recuse himself from further proceedings in this case and it subsequently appointed the Honorable Harry E. Knafelc to preside over this matter. Petitioners filed an application for emergency relief with the Pennsylvania Supreme Court. Our Supreme Court ultimately vacated the order appointing Judge Knafelc and appointed the Honorable Paul F. Lutty, an out-of-county judge, to preside over this case. See Pa.R.J.A. 701(C)(2) (explaining the process by which assignment of another jurist is made in order "to serve the interest of justice").

A non-jury trial commenced in October of 2018, during which all of the testimony previously made before Judge McBride was freshly presented to the newly-appointed judge. After the trial concluded, Judge Lutty entered the following findings of fact and conclusions of law:

> Petitioners [] filed a challenge to the validity of a will purportedly executed by John J. Thomas, on July 7, 2014[,] at the Rochester Manor Nursing Home in Beaver County, Pennsylvania. The will specifies that John J. Thomas bequeathed all of his estate to [Appellant], his second cousin. [Appellant] has asserted that the signing if [sic] the will at issue was witnessed by William M. Braslawsce, Attorney at Law, and his son, Zeesha Braslawsce. It is not contended that any other individuals were present at the signing. The will was notarized sometime later by Lu Anne Cilli, who … was not present at the signing.
>
> Depositions were taken of all witnesses to the purported signing, as well as others. Hearings were held before [j]udges in Beaver County, Pennsylvania. This court was requested to make a final determination as to the validity of the will. Therefore, hearings were held in Allegheny County before this court on October 22-25, 2018, November 9, 2018[,] and closing arguments were heard on January 18, 2019. This court had

access to review the deposition transcripts of the witnesses, transcripts of the Beaver County proceedings and all proceedings before this court.

Determination of the validity of the John J. Thomas will rested upon an evaluation of the credibility of the witnesses to the will, as well as other witnesses, and the credibility and qualifications of two (2) handwriting experts chosen by the parties. After months of consideration, it is this court's determination that the will purportedly executed by John J. Thomas on July 7, 2014, as well as all other documents purportedly executed by him on that date, are invalid. This court agrees with handwriting expert, J. Wright Leonard, that the signatures on the will and accompanying documents are not that of … [Mr.] Thomas. This court finds that the testimony of the only witnesses to the signing of the will is not credible.

Finally, this court finds in favor of [] Petitioners that the letters testamentary must be revoked. Therefore, the late John J. Thomas, having made no will during his lifetime, died intestate. His estate shall legally pass on to his intestate heirs, who are the petitioners herein. Judgment is awarded in favor of Petitioners and against [Appellant].

Trial Court Order, 3/28/19, at 1-2 (unpaginated; unnecessary capitalization omitted).

On April 15, 2019, Appellant filed a timely appeal. The trial court did not order the filing of a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant now raises the following issues for our review:

A. Whether oral settlement agreements are enforceable under Pennsylvania law[?]

B. Whether [Appellant] and [Petitioners] entered into an enforceable settlement agreement, which was placed on the record at a June 29, 2016 proceeding[?]

Appellant's Brief at 4 (unnecessary capitalization omitted).

We begin by setting forth our scope and standard of review:

- 4 -

> The enforceability of settlement agreements is determined according to principles of contract law. Because contract interpretation is a question of law, this Court is not bound by the trial court's interpretation. Our standard of review over questions of law is de novo and to the extent necessary, the scope of our review is plenary as [the appellate] court may review the entire record in making its decision.
>
> Ragnar Benson, Inc. v. Hempfield Township Mun. Auth., 916 A.2d 1183, 1188 (Pa. Super. 2007) (citations and quotation marks omitted). With respect to factual conclusions, we may reverse the trial court only if its findings of fact are predicated on an error of law or are unsupported by competent evidence in the record. Skurnowicz v. Lucci, 798 A.2d 788, 793 (Pa. Super. 2002) (citation omitted).

Mastroni-Mucker v. Allstate Ins. Co., 976 A.2d 510, 517-18 (Pa. Super. 2009).

In his first issue, Appellant properly asserts that oral settlement agreements are enforceable under Pennsylvania law.

> Where a settlement agreement contains all of the requisites for a valid contract,[2] a court must enforce the terms of the agreement. McDonnell v. Ford Motor Co., ... 643 A.2d 1102, 1105 ([Pa. Super.] 1994).... This is true even if the terms of the agreement are not yet formalized in writing. Mazzella v. Koken, ... 739 A.2d 531, 536 ([Pa.] 1999); see Commerce Bank/Pennsylvania v. First Union Nat. Bank, 911 A.2d 133, 147 (Pa. Super. 2006) (stating "an agreement is binding if the parties come to a meeting of the minds on all essential terms, even if they expect the agreement to be reduced to writing but that formality does not take place[]"). Pursuant to well-settled Pennsylvania law, oral agreements to settle are enforceable without a writing.

---

[2] "There is an offer (the settlement figure), acceptance, and consideration (in exchange for the plaintiff terminating his lawsuit, the defendant will pay the plaintiff the agreed upon sum)." Mastroni-Mucker, 976 A.2d at 518 (internal citations and quotation marks omitted).

> Pulcinello[ v. Consolidated Rail Corp., 784 A.2d 122, 124 (Pa. Super. 2001)] (citing Kazanjian v. New England Petroleum Corp., … 480 A.2d 1153, 1157 ([Pa. Super.] 1984)).

Id.  See also Step Plans Services, Inc. v. Koresko, 12 A.3d 401, 409 (Pa. Super. 2010).  Moreover, we recognize that "[f]amily settlement agreements are favored in this Commonwealth because they are an attempt to avoid potentially divisive litigation.  Where a fair and valid agreement is present[,] it will be upheld whenever possible; in the absence of fraud the agreement is binding even though based on an error of law."  In re Estate of Boardman, 80 A.3d 820, 822 (Pa. Super. 2013) (internal citations and quotation marks omitted).

In order for an oral settlement agreement to be enforceable, however, it is clear that all essential terms must be agreed upon.

> Our Supreme Court, in Woodbridge v. Hall, … 76 A.2d 205 ([Pa.] 1950), held that an oral agreement to settle, which included the essential terms of the agreement between the parties, was enforceable, even though the parties were unable to agree, despite numerous drafts, to the terms of a written settlement agreement.

Compu Forms Control, Inc. v. Altus Group, Inc., 574 A.2d 618, 623 (Pa. Super. 1990) (emphasis added).  "[I]f parties agree on essential terms and intend them to be mutually binding, a contract is formed even though the parties intend to adopt a formal document later which will include additional terms."  Id. at 624 (emphasis added).  See also Luber v. Luber, 614 A.2d 771, 773 (Pa. Super. 1992) (stating that "[a]s long as the oral agreement contained the essential terms of the … settlement, it could be enforced," and

- 6 -

the fact that they intend to reduce the agreement to writing does not prevent enforcement) (emphasis added).

Instantly, Appellant argues that the record supports the finding of a settlement agreement between the parties and that the orphans' court erred in failing to enforce said agreement. Appellant's Brief at 16. More specifically, Appellant proffers that "the transcript of the lower court proceedings shows that on June 29, 2016, in open court, counsel for the parties recited and agreed upon the essential settlement terms." Id. Appellant further states that "[d]espite the terms recited and agreed upon in court, [Petitioners] refused to execute a written settlement agreement, and Appellant was forced to present a Petition to Enforce Oral Settlement Agreement, which was denied." Id.

In contrast, Petitioners assert that no enforceable contract had yet been formed at the June 29, 2016 hearing, as the parties had not yet agreed upon all the essential terms necessary to form an agreement. In support of their position, Petitioners note that counsel for Appellant stated on the record: "The … next element of the settlement agreement … is that there shall be a settlement agreement reduced to writing signed by all parties…." N.T. Hearing, 6/29/16, at 11. Petitioners argue that the requirement for the parties to reduce a settlement agreement to writing indicates only that the parties intended to reach an agreement "sometime in the future," Petitioners' Brief at 10, and that "it is clear that the parties had not agreed on essential terms of settlement, but for the requirement of a written settlement

- 7 -

agreement." Answer to Petition to Enforce Settlement Agreement at 3-4 ¶11. "Implicit in the requirement of a written settlement agreement is that the parties would negotiate and agree upon the nature and scope of the release and other specific terms of settlement, including requisite consideration, in their written agreement." Id. at 4 ¶11.

Moreover, Petitioners point to written letters between counsel for both parties following the evidentiary hearing, which illustrate a pattern of offers and denials between the parties' counsel, supporting their position that negotiations of settlement terms were ongoing and that no enforceable agreement had yet been reached. Petitioners' Brief at 4. Petitioners further argue that even if an oral contract had been formed at the hearing on June 29, 2016, "such alleged contract was rendered unenforceable and void due to the unclean hands of [Appellant], who had offered for probate a forged will, an instrument forming the basis for his supposed rights in the [e]state of [Mr.] Thomas[.]" Id. at 4-5.

The orphans' court agreed with Petitioners that there was no settlement to be enforced, see N.T. Hearing, 8/23/16, at 4, and denied Appellant's petition accordingly. Judge Lutty noted that although he had no firsthand knowledge of the alleged oral settlement agreement, he did have access to the record made before the prior judge and, thus, he could specify where in the record Judge McBride's reasons for denying the petition to enforce an oral agreement may be found. Trial Court Memorandum ("TCM"), 6/27/19, at 2. Referencing the June 29, 2016 transcript, Judge Lutty opined:

- 8 -

Richard P. Joseph, Esquire, appeared on behalf of Petitioners and Kenneth Lewis and Richard Holzworth appeared on behalf of the estate and … Appellant[] herein.

On page three (3) of the transcript, Attorney Joseph indicated that he would like to put a settlement agreement on the record. As counsel for the estate began to recite the oral terms of the agreement, Judge McBride interrupted and inquired at what point [Appellant] would file his first accounting….

Attorney Lewis… responded, "We have not discussed that, your Honor." Judge McBride expressed the importance of an accounting, stating, "I will tell both of you that Judge McBride wants to know that there is an appropriate and proper accounting for every cent that comes into any decedent's estate in this County[,]" and "I'm telling you that I prefer an accounting."

Another element of the settlement was brought up by Attorney Lewis for [] Appellant[]. "The … next element of the settlement, your Honor, is that there shall be a settlement agreement reduced to writing signed by all parties, [Appellant,] as well as all clients[] represented by Mr. Joseph. The agreement will contain mutual releases running in favor of [Appellant], Esther Ungarean, their attorneys, Fox Rothchild[,] and running mutually in favor of Mr. Joseph and each of his clients."

Id. at 2-3 (unnecessary capitalization and citations to record omitted).

In further support of the orphans' court's denial of Appellant's petition,

Judge Lutty stated:

[Judge McBride] expected to have a signed settlement within the next thirty (30) days. However, no written and signed settlement agreement was submitted to Judge McBride within thirty (30) days. Instead, on August 2, 2016, another transcript was made of a hearing, entitled "Motion." Only Richard Holzworth appeared on behalf of [Appellant], who intended to present a petition to enforce settlement. Mr. Holzworth explained, "There is a dispute in the negotiations of … the written settlement agreement," to which the Judge responded, "I realize that there is … a dispute."

…

At the final hearing regarding settlement, with both the parties' attorneys present, a transcript was made on the argument

of Appellant's motion to enforce oral settlement agreement, which argument took place on August 23, 2016. The court recognized that the parties had not reached a settlement to be enforced. Further, Judge McBride advised, "I will suggest to all three of you gentlemen, if you think there is any possibility of settling this case, you had better present a document signed to my chambers, signed by all three of you, and signed by your clients before I will consider any settlement proposal."

After much argument and personal confrontation, Judge McBride took the motion to enforce oral settlement, as well as other motions not relevant to this appeal, under advisement[,] and entered an order denying the motion [that] same day.

Id. at 3-4 (unnecessary capitalization and citations to record omitted). Judge Lutty therefore concluded that, "[f]rom the record before Judge McBride, it is clear that he recognized unresolved issues remaining in dispute that precluded the parties' completion of a written agreed settlement." Id. at 4. Based on our review, we deem the lower court's finding that no oral settlement agreement had been reached to be supported by the record. We discern no error of law or abuse of discretion by the orphans' court.

We agree with Petitioners that the record merely reveals a negotiation of proposed terms of a settlement agreement, and that no meeting of the minds occurred at the June 29, 2016 hearing regarding all essential terms of a contract. While listing some of the proposed terms of settlement on the record, Appellant's counsel stated that he would "welcome any corrections or modifications." N.T. Hearing at 4. Judge McBride interrupted to inform the parties that he would require as part of the settlement an accounting of the estate by Appellant, to which Appellant's counsel replied: "We have not discussed that, Your Honor." Id. at 6. Additionally, the following dialogue

between the court and the parties' counsel supports the conclusion that a settlement was expected but had not yet been reached:

> THE COURT: Can I … expect that I am going to have some conclusion of this matter with signed settlement agreements … within the next 30 days?
>
> MR. JOSEPH: I don't see why not.
>
> MR. LEWIS: Yes, Your Honor. That is reasonable.

Id. at 15-16.

Moreover, the record contains correspondence between the parties' counsel following the June 29, 2016 hearing, which further illustrates that negotiations were ongoing and that no formal agreement had been reached. For instance, by letter dated July 8, 2016, Mr. Lewis sent Mr. Joseph a "draft" settlement agreement and indicated that he had not yet had an opportunity to review it with Appellant and expressly reserved the right "to modify the draft, should that be necessary." Mr. Joseph replied by letter dated July 19, 2016, in which he informed Mr. Lewis that "we do not accept the terms that you have set forth in your [s]ettlement and [r]elease [a]greement…. We will prepare and forward to you a redline version identifying the areas of disagreement." Answer to Petition to Enforce Oral Settlement Agreement, Exhibit 2 (emphasis added).

Appellant insists that he and Petitioner "agreed to the essential terms necessary to form an enforceable settlement agreement[,]" and that "[a]side from boilerplate and other non-essential terms sometimes found in settlement agreements, the terms recited and agreed upon by counsel for both parties

- 11 -

contain all of the substantive elements that one would expect to find in a complete settlement agreement." Appellant's Brief at 24, 26 (citing Luber, 614 A.2d at 773-74 (finding that there was no evidence that "boilerplate" language was essential to the settlement agreement or that it would materially alter the terms of the agreement between the parties)). The record belies Appellant's claims.

It is well-settled that,

for an agreement to exist, there must be a "meeting of the minds," ...; the very essence of an agreement is that the parties mutually assent to the same thing.... The principal that a contract is not binding unless there is an offer and an acceptance is to ensure that there will be mutual assent....

Schreiber v. Olan Mills, 627 A.2d 806, 808 (Pa. Super. 1993). Instantly, the record clearly reflects that there was no meeting of the minds between the parties sufficient to form an enforceable settlement agreement and that the matters subject to disagreement consisted of more than mere boilerplate language.

For instance, one main issue of dispute between the parties is the matter of releases—particularly, the release to be issued in favor of Appellant. The parties stated on the record at the hearing that the settlement agreement "will contain mutual releases running in favor of [Appellant], Esther Ungarean, their attorneys, Fox Rothschild, and running mutually in favor of Mr. Joseph and each of his clients." N.T. Hearing at 11. According to Appellant, Petitioners agreed to completely and unconditionally release Appellant of all claims. Petition to Enforce Oral Settlement Agreement, 8/2/16, at 2 ¶ 9, 5 ¶¶ 20-21

(emphasis added). However, Petitioners aver that "[e]ssential terms of a release were not discussed by Mr. Lewis and [Mr.] Joseph..., let alone agreed upon by them." Answer to Petition to Enforce Oral Settlement Agreement, 8/11/16, at 2. Petitioners admit that the parties agreed in principle to release each other and their counsel from liability for claims relating to the validity of the will and probate of the will. They deny, however, that they ever agreed to grant an absolute and unconditional release to Appellant. Id. at 7 ¶ 18(e), 8 ¶ 20.[3] It is evident that there was no meeting of the minds regarding the essential term of the scope of the release to be granted to Appellant. Thus, the orphans' court properly denied Appellant's petition to enforce oral agreement.

Finally, we note that even if we were to conclude that a valid, enforceable settlement agreement was reached at the June 29, 2016 hearing, we would deem Appellant's forging of the will to be such conduct that constitutes "unclean hands" which would bar him from relief in equity.

> In the exercise of the limited jurisdiction conferred on it by statute, it is plain that the [o]rphans' [c]ourt must apply the rules

_____

[3] We further note that Mr. Joseph stated in his July 21, 2016 letter to Mr. Lewis:

> You suggest that [Appellant] must be released immediately and unconditionally.... There was no discussion, let alone an oral agreement that he would be released in this fashion. He will be released, but only conditionally and when it is determined that his handling of ... [e]state assets was not improper and that he did not harm the [e]state.

Answer to Petition to Enforce Oral Settlement Agreement, Exhibit 2.

and principles of equity. Thus, the familiar equity maxim "he who comes into a court of equity must come with clean hands" applies to matters within the [o]rphans' [c]ourt's jurisdiction.

The maxim itself is derived from the unwillingness of a court to give relief to a suitor who has so conducted himself as to shock the moral sensibilities of the judge, and it has nothing to do with the rights or liabilities of the parties. Public policy not only makes it obligatory for the court to deny relief, once a party's unclean hands are established, but to refuse the case.

This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief ... that doctrine is rooted in the historical concept of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. Thus[,] while equity does not demand that its suitors shall have led blameless lives[] ... as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue....

In re Estate of Pedrick, 482 A.2d 215, 222 (Pa. 1984) (internal citations and quotation marks omitted). "The clean hands doctrine does not bar relief to a party merely because his conduct in general has been shown not to be blameless; the doctrine only applies where the wrongdoing directly affects the relationship subsisting between the parties and is directly connected with the matter in controversy." Id. at 222-23.[4]

This Court recently determined in Morgan v. Morgan, 193 A.3d 999 (Pa. Super. 2018), that the trial court abused its discretion when it failed to

_____

[4] Chief Justice Nix, in his concurring opinion, also acknowledged that "[t]he proponent of a will cannot seek the aid of a court of equity to secure the probate of a will, the execution of which was effectuated by his own wrongdoing." Id. at 224 n.1 (citing Cross' Estate, 179 A. 38 (Pa. 1935); Hays' Estate, 28 A. 158 (Pa. 1893)).

apply the doctrine of unclean hands. In Morgan, the husband petitioned the trial court for a reduction of his alimony obligation, based on false documentation and testimony regarding his income, including two sets of false tax returns. We concluded that the husband's fraudulent production and testimony was "within the purview of the unclean hands doctrine[,]" and opined:

> In light of the fraud that [the] [h]usband committed not only on the court, but also to the parties and judicial system itself, the trial court should have invoked the doctrine of unclean hands and denied [the] [h]usband's request to modify [his] alimony obligations.
>
> ...
>
> This Court finds [the] [h]usband's conduct to be appalling; it most certainly shocks the moral sensibilities of this Court.

Id. at 1006-7.

Similarly, we conclude that the facts of the instant case fall within the purview of the doctrine of unclean hands. Moreover, we deem Appellant's conduct of forging the will and naming himself as the sole beneficiary of the estate, to the detriment of Petitioners, as shocking to the moral sensibilities of this Court. The only equitable result is to deny Appellant's petition to enforce the oral agreement.

Accordingly, we affirm the March 28, 2019 order finding the purported will of John J. Thomas invalid and revoking the letters testamentary granted to Appellant.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/6/2020